UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND Cort Org.

Stephen Reise Pro Se

v. case No. 04-0158ML

A.T. Wall et al

**OBJECTION TO THE REPORT AND RECOMMENDATION OF THE GRANTING OF SUMMARY JUDGMENT TO DEFENDANTS WALL, MAROCCO AND WHITE**

Plaintiff Stephen Reise objects to the Magistrates Report and recommendation as stated below as defined in **Bold type;**

Page 1, Para. 1 - **"Plaintiff did not file an opposition thereto"**

Objection - Plaintiff disputes the Magistrates statement, the plaintiff filed a timely response on March 10 2005, within the requested extension of time of a twenty-one day extension motion filed on February 17 2005. The plaintiffs opposition was refused for exceeding the page limitations and not requesting leave of court because my imperfectly pled caption referred to my opposition as a countermotion. The opposition's caption was entitled "Countermotion and response to the defendants A.T. wall, Joseph Marocco, and Melvin White's Motion for summary Judgment". Because the Magistrate had set an ORDER on February 1 2005, that all motions filed with the Court must request leave of court to be filed. It was not clear to me as to why I had to file for leave of court or what I had to do to become compliant when two other responses were accepted without requiring leave of court. It was not only until I received the courts MEMORANDUM AND ORDER of April 26 2005, in which it clearly stated; "Plaintiff has never sought, nor has been granted leave to file a counter motion for summary judgment". The plaintiff used the word counter motion to be meant as his motion to counter the defendants motion for summary judgment, such as a response to counter their motion, However, I now understand that it reflected the intention that I was seeking summary judgment against the defendants. This confusion became clear to me through the recent filing of a MOMORANDUM OF LAW from

the defendants responding to my "objection to Magistrate Hagopians memorandum and order of June 13 2005", with a certification date of July 8 2005, at page two (2). Here the underlining of the word against in their statement, "summary Judgment against the defendants" in two separate places throughout this page, that it was not just the word "COUNTER MOTION" that necessitated it as calling for leave to be filed, but its legal interpretation. However, Mr. Field candidly takes advantage of my inexperience and attempts to use my inexperience as to what he refers to shortcomings, to assert that my actions were intentional and non-compliant, as is not the case.

The Court allowed me a second chance to file opposition in its April 14 2005 ORDER, which required my opposition filed by April 25 2005. The plaintiff was not in line with the Magistrates decision pertaining to the page limitations or restrictions placed on the pro se plaintiff after he had spent some three months pay in copy costs and postage and was stripped of his basic necessities to do so. These page limitations that were imposed in the above April 14 2005 ORDER limited me to the same page limitations this court granted the defendants by motion back in January 2005. My argument is the courts granting of these page limitations to the defendants upon their request by motion back in January and now forcing them upon the pro se plaintiff is judically unfair. In essence, the court has allowed the defendants to set the page limitations by granting their motion. Not only has this in essence allowed the defendants to set the page limitations, but has allowed them to be set based on the defendants ability to plead the issues as skilled attorneys. Certainly if a skilled attorney trained in heightened pleading needs thirty-five (35) pages to adequately address all the issues of summary judgment, it only seems logical that the inexperienced pro se, who is not nearly as well versed in presenting his pleadings may need an additional seven pages to adequately plead the same issues.

Thereafter, I filed my opposition a second time, with a motion to file instanter and exceed the page limitaitons designated by the court. Up to this point I had no understanding of why leave of Court was needed in this response. Thus, my filing of my second response with a motion to try and remedy the page limitation problem was filed April 18 2005, and timely filed within the courts ORDER dated April 14 2005, which stated my opposition must be filed

by April 25 2005. My response was returned a second time, however, my "Motion to file instanter and exceed the page limitations....." was not returned with my opposition, leading me to believe that it was being considered. Thus not only was my second request to file my opposition timely, I sought to remedy the problem for which it was refused, which went completely unanswered.

Thereafter an ORDER of April 26 2005 by Magistrate Hagopian was received who ordered my second timely response returned due to the page limitations without ruling on my "Motion for leave to file instanter and exceed the page limits.... "

Moreover, the Magistrate referred to the courts ORDER of February 1 2005 prohibiting further filing of motions witout leave of court and stated "Plaintiff has never sought, nor has been granted leave of court to file a counter motion for summary judgdment". It should be noticed that this ORDER was entered one day after the April 14 2005 ORDER stating "no further extensions" and after the April 25 2005 cut off date to file a response.

The plaintiff attempted to solve the problem of the page limitations problem on April 18 2005 by motion, which was never answered, but apparently refused, however, never mentioned at all in the April 26 2005 ORDER itself. Still not in line with the decision of being held to the same page limitations as skilled attorneys, who basically set the limitations on their ability to plead the issues and the courts forcing these same page limits on the pro se seems to be judically unfair and an abuse of discretion and may violate my rights as a pro se. I appealed to a District Judge by a timely May 2 2005 request for review under Rule 72 (a) was filed, which was timely DENIED on May 10 2005. This resulted in a appeal process to the court of Appeals for the First circuit on May 18, 2005.

Four, (4) working days since the entering of Magistrate Hagopian's April 26 2005 ORDER revealing the nature of my violation of the February 1 2005 leave of court issue and my enlightenment as to my countermotion's misinterpretation through my inexperience in pleading, I sought to remedy this problem. May 2 2005, the plaintiff filed for a "motion for leave to file Countermotion and response to the defendants Wall, Marocco and White's Motion for Summary Judgment" This was an attempt to timely remedy the second problem for which my second timely filing of my response was refused as stated in the

April 26 2005 ORDER. This motion entered May 2 2005 was answered forty-two days later after it was filed and was DENIED through the Magistrates June 13 2005 MEMORANDUM AND ORDER of which I have filed a timely objection to on June 23 2005.

There can be no question that the Pro se plaintiff has timely filed an opposition on two occasions. Of Course there is the exception of the Assistant Attorney General Michael Field who seems to know nothing about 28 USC 1746, in which the filing date of my documentation is considered filed on the date it is placed in the interdepartmental mailbox, or perhaps this too is a license to break the court rules or leeway that I should not be afforded. The bottom line is my response was placed in the interdepartmental mailbox on March 10 2005, not March 14 2005 and considered timely filed. In short my filings on both occasions were timely, that the pro se has sought to remedy each problem with his filings in a timely diligent manner.

It appears that because the pro se is not in line with the decision of the court and feel its judicially unfair and possibly questionable and that the plaintiff has chose to question the courts decision by way of appeal, that the court has created the impression that perhaps some animosity exists. The fact that the Court seems to be on a path to circumvent the pro se's ability to question its decision by proceeding directly to summary judgment as the defendants attorney Mr. Field has requested, before the plaintiff can seek review and correct his problems for which his opposition was refused.

The appearance that my request for permission to the district court to appeal to the Court of Appeals under 28 USC 1292(b) and my order submitted on May 23 2005 in which I sought permission and a stay on the District court proceedings pending appeal has not been answered now some forty-seven (47) days since it was filed and the Magistrate has since on June 13 2005 moved to grant summary judgment to the defendants without allowing a response by the pro se through his report and recommendation, supports the effect of claimed animosity.

Wherefor the pro se adamantly objects to the Magistrates statement that the "plaintiff did not file an opposition thereto", as if I was wrong for requesting review. Furthermore, the plaintiff points to Mr. Fields request that summary judgment be ruled on before the decision to hold the plaintiff to the page limitations has been reviewed is inappropriate, the fact that the court has stampeded

over my 1292 (b) motion and ignored its request to stay proseedings pending appeal and gone on to grant Mr Fields request of ruling on summary judgment before the page limitations are reviewed or before my 1292 (b) motion is ruled on in time to provide any benefit of relief adds to this effect.

## P.L.R.A. 1997e ARGUMENT

The plaintiff refers to page three (3) of the Inmate Grievance procedure policy 13.10 DOC. This clearly states under section 6, subsection d and g at page four (4), that decisions of discipline boards and decisions by qualified medical personnel related to inmates health, are NON-GRIEVABLE AREAS OF INMATE LIFE. (EXH. "A")

This complaint as Magistrate Hagopian stated in his own words in his ORDER of the court entered December 16 2004; "Plaintiffs complaint rests chiefly upon inadequate medical care under the Eighth Amendment". The word chiefly designates it as the main or major part of my complaint. the inadequate medical care is based on decisions by qualified medical personnel relating to inmate health, or my health in relation to the diagnosis, treatment and follow up care of which I received, thus resulting as clearly falling under the NON GRIEVABLE AREA OF INMATE LIFE. The fact that the defendants used defenses to shield them from liability such as the request slip policy by stating that they did not receive prior requests for medical care or replacement parts has been brought under scrutiny by their own defense and is merely one of the inadequacies that they have used to avoid the chief complaint of inadequate care suffered by the decisions of qualified medical personel. The Magistrate has erred by claiming the policies that prevented me from receiving adequate medical care and effected the acts or omissions in the formulation and implementations of these decisions by qualified medical personnel should be separated from the main claim. The tail does not wag the dog and the decisions by qualified medical personel are effected by inadequate policies. In this case my allegations clearly state that decisions by qualified medical personnel to ignore requests for medical care because they are fully aware the inmate such as myself through the current policy are deprived from any means to prove a request was made for medical care.

The ability to ignore a medical request on the basis that the inmate can never prove that a request or requests were ever submitted, and then use this as a defense to avoid liability and or aids in the decisions by qualified medical personnel of who receives care and when. Certainly the policy of how the request slips are handled clearly creates a window with great opportunity or leeway or influence to provide the ability to make very poor decisions without being subject to any liability for those decisions for the care of myself and others.

Furthermore policies such as sick call and other medical policies or health care policies are monitored by qualified medical personnel as having the final decision in there formulation and implementation. It is fact that decisions of qualified medical personnel can override even security protocol of the warden.

**MEMORANDUM OF LAW**

Courts have held that if an issue is not "grievable", you should not be required to exhaust the grievance system because it was not "available" for your problem. In MOJIAS V. JOHNSON, 351 F3d 606, 610, have ruled that courts must establish that the prisoners claim does not fall into an exception to the administrative remedy. SNYDER V. MELINDEZ, 199 F3d 108,114, "the provision clearly does not require a prisoner to exhaust administrative remedies that do not address the subject matter of his complaint." MCGRATH V. JOHNSON, 67 Fsupp 499, 510,511, stating inmate grievance procedure not required to contest a determination that could not be appealed using the inmate grievance procedure.

Courts have gone as far as holding that issues over which the grievance system has no actual authority need not be exhausted, even it they are not listed as non-grievable such as STEVENS V. GOORD, 2003 U.S. Dist. Lexis 10118 at *17, Where a private prison medical provider failed to show that the prison grievance would actually have authority over claims against it.

Unavailability and obstruction or affirmatively misleading the inmate by prison staff has afforded inmates equitable estoppel from having to exhaust administrative remedies such as the grievance procedure. Remedies have been made unavailable by other forms of obstruction by prison staff, purposeful or otherwise.

MILLER V. NORRIS, 247 F3d 736, 740, "We believe that a remedy that prison officials prevent a prisoner from 'utilizing' is not an available remedy under § 1997e(a) and that Mr. Millers allegations raise an inference that he was prevented from utilizing the prison's administrative remedies."

Misinforming prisoners about their availability or operation has made them unavailable such as CROSWELL V. MCCOY, 2003, WL 962534 at *4, holding that a prisoner who relies on prison officials representation as to the correct procedure has exhausted.

The failure to inform prisoners about remedies existance or their availability or operation have made them unavailable. Cases such as ALVEREZ V. U.S., 2000, WL 557328 at *2, states a showing that the prisoner was not "meaningfully informed" about administrative remedies could establish they were not available. LEE V. WALKER, 2002 WL 980764 at *2, held that a prisoner who sent his grievance appeal to the wrong place would be entitled to reconsideration of dismissal if he showed that the prison handbook said it was the right place.

Now it can be clearly evidenced on page 31 of the rules and regulations hand book that at section 5. under **LEVEL #1 Procedure:** states "superior officer must sign and date in the margins of the form." At section 7. it states, "Superior officer will forward the three remaining copies to the facility Grievance Coordinator."

In my opposition which I have yet to be able to file and in previous litigation I expressed that I approached deputy Warden Kaszak and Lieutenant Murnier to sign my grievances in the dining room in August 2004. At this time they refused to sign the grievance saying the Grievance coordinater must sign it. Despite the hand book states that a superior officer can sign the form and is actually suppose to submit it as well as sign it, despite the grievance form itself appropriates an area for the signiture under a section labeled **STAFF MEMBER SIGNITURE**, should show that the procedure is misleading with the intent to make the procedure unavailable and affirmatively misleading effecting the utilization of the operation of the procedure and the very failure to follow the handbooks rules in signing and submitting the grievance violates the "meaningfully informed" verbatim of ALVEREZ SUPRA. This deviation from the handbook deserves reconsideration of dismissal in relation to LEE SUPRA. (EXH. "B" HANDBOOK)

Under CROSWELL SUPRA, if I rely on prison officials representations, as the handbook could be held equal to, as to the correct procedure, then I have exhausted my remedies.

CROSWELL SUPRA, dealt with misinforming prisoners about the availability or operation, as was certainly done here. If the "carved in stone", so to speak HANDBOOK is expected to meaningfully inform me about administrative remedies and does not do so, (as stated in ALVEREZ), and that the HANDBOOK suggests a remedy that prevents a prisoner from utilizing, the administrative remedy is not available as a remedy under § 1997e (a), (as stated in MILLER SUPRA).

Therefore, this HANDBOOK, which is the prison official's representation as to correct procedures to the Inmate, and the inmate is reliant upon these HANDBOOKS as containing the correct procedures, the inmate has exhausted under the meaning of CROSWELL SUPRA. It should be known that this was my first time in filing a grievance or grievance's and I relied on the prison officials representation of the rules as reflected through the prison HANDBOOK. After speaking with the Deputy Warden and the Lieutenant and they refused to sign or submit my grievances I sought lieutenant Flynn on two separate occasions of which I sacrificed library time to meet with him, but he was found unavailable.

The fact that the HANDBOOK reflects that any superior officer can sign the grievance and is also responsible for submitting it, combined with the grievance form itself which states that a staff member signature is required and this procedure is no longer used creates scenarios of unavailability. I was not meaningfully informed on how to utilize the grievance procedure and was in fact affirmatively misled without any formal advisory of new procedures. In support I refer to HALL V. SHEHAN, 2001 WL 111019, at *2, holding that an institution cannot keep inmates in ignorance of the grievance procedure and then fault them for not using it, which also quoted, "A grievance procedure that is not madeknown to inmates is not an 'available' administrative remedy".

On July 8 2005, I filed the attached informal grievance, on July 11 2005 I was called to shift command and discussed the fact that SICK CALL had been closed inter alia. At which Lieutenant Flynn told me to file a grievance in which my response was "is that necessary ?". At which point the lieutenant advised the closings (EXH. "C" ATTACHED)

were due to understaffing in the medical department which is non-grievable. My point being that you can not ask me to exhaust adminstrative remedies pertaining to medical areas when there are none. You can not ask me to utilize administrative policies that are not available.

It is clear that the magistrate Hagopian has erred by failing to establish if the plaintiffs claims fall into an exception to the adminstrative remedy as states in MOJIAS SUPRA. Cases such as SNIYDER SUPRA. clearly states that administrative remedies need not be exhausted when they do not address the subject matter of the complaint. However, the magistrate seeks to grant summary judgment to the defendants based on the remedies the inmate seeks, even if some or all of the relief I seek is not available through the administrative process. The Magistrate has put the cart before the horse in applying the P.L.R.A.'s 42 USC § 1997 (e), before establishing if it is applicable or whether it may fall within the exception to the administrative remedy that Courts must establish, as quoted in MOJIAS SUPRA.

Wherefore the plaintiff claims that not only should the P.L.R.A.'s 1997e not apply, they are non-grievable, and all other claims should be found as exhausted due to the inability to utilize the administrative procedure as stated in MILLER SUPRA. Furthermore through the misinforming prisoners about the operation through the inmate HANDBOOK which violates the meaningfully informed prerequisite of ALVEREZ SUPRA and CROSWELL SUPRA'S holding "that a prisoner who relies on prison officials representatives as to correct procedure has exhausted." Thus, the Magistrates granting of summary judgment to the defendants based on the plaintiffs failure to exhaust his administrative remedies can not stand.

Respectfully,

STEPHEN REISE PRO SE
P.O. BOX 8274
CRANSTON, RI, 02920

**CERTIFICATION**
**28 USCA 1746**

I hereby swear upon the penalty of perjury that a true copy of this documentation was mailed through the interdepartmental mail system, postage pre-paid, on this 14 day of July, 2005, and mailed to the persons below;

JAY ELIAS ESQ.
1600 FINANCIAL PLAZA
PROVIDENCE, RI, 02903

ALAN TATE ESQ.
321 SOUTH MAIN STREET
PROVIDENCE, RI, 02903

MICHAEL FIELD
ATTORNEY GENERALS OFFICE
150 SOUTH MAIN STREET
PROVIDENCE, RI, 02903

b. by the inmate directly affected by the alleged incident;

c. within three (3) days of the actual situation/incident or within three (3) days of the inmate's becoming aware of same.

3. Discipline. Inmates will not be subject to disciplinary charges for utilizing the Grievance Procedure. (Exception: See Abuse of the Inmate Grievance Procedure.)

4. Assistance. All inmates in RIDOC's custody have access to the Inmate Grievance Procedure. Special provisions shall be made to ensure access for the impaired, handicapped, illiterate, or those with language barriers. Inmates may contact the Counseling staff within their facilities for needed assistance.

5. Grievable Areas of Institutional Life

a. Interpretation and application of policies, rules, and procedures of the facilities and/or Department;

b. Individual employee and/or inmate actions, including any denial of access to the Inmate Grievance Procedure, other than as provided herein;

c. Formal or informal reprisal for use of or participation in the Inmate Grievance Procedure;

d. Property loss or damage;

e. Any other matter relating to access to privileges, programs, and/or services; conditions of care or supervision; and living facility conditions within the authority of the RIDOC, except as noted herein.

6. Non-Grievable Areas of Institutional Life

a. State and Federal laws and regulations;

b. State and Federal Court decisions;

c. Formulation of Departmental policies;

d. Decisions of Discipline Boards [governed by Morris v. Travisono, 499 F. Supp. 149 (1980) and including a separate disciplinary appeal process];

EXHIBIT "A" 2 of 2



e. Decisions of Classification Boards [governed by Morris v. Travisono, 499 F. Supp. 149 (1980) and reviewed by the Director or designee];

f. Designation of an inmate as a Security Risk or Protective Custody inmate (reviewed by Director or designee);

* g. Decisions by qualified medical personnel related to an inmate's health;

h. Unlawful acts committed by inmate(s);

i. Matters beyond the control of the RIDOC, including decisions of the Parole Board.

7. Abuse of the Inmate Grievance Procedure

a. Punishment or disciplinary actions will not result from an inmate's submitting a complaint or grievance unless the inmate demonstrates a pattern of abuse of this process by submitting clearly frivolous, repetitious, or knowingly false documents.

b. An inmate who files five or more (5) grievances in a week or twenty or more (20) in any consecutive 180-day period may be determined to be abusing the Inmate Grievance Procedure.

c. An inmate may be limited to not more than ten (10) active grievances at one time, not including any emergency grievance(s).

d. Abuse of the Inmate Grievance Procedure shall be determined by the Warden of the inmate's facility.

1. A determination of abuse shall result in a limitation on the grievance process or on a particular subject.

(a) The Warden shall establish the length of limitation commensurate with the degree of abuse.

(b) The length of limitation may be for up to six (6) months and may be increased for second and subsequent abuse in increments not to exceed six (6) months.

(c) Inmates under limitation for abuse of the Inmate Grievance Procedure shall be allowed to file emergency grievances.

# EXHIBIT "B"

**GRIEVANCE PROCEDURES:**

The aggrieved must file his grievance within three (3) days of the incident and/or actual knowledge of the origination of the problem.

The following are the three areas non-greivable by the inmates:

1. Decisions by the Discipline Board -- Those inmates dissatisfied with the Disciplinary Board's decisions should appeal said decision through the existing disciplinary appeal procedure.
2. Decisions made by qualified medical personnel related to an inmate's health.
3. Unlawful acts committed by an inmate are not grievable by the inmate.

When an inmate makes a request for the resolution of a grievance, it must be accomplished utilizing the following levels and procedures.

Level #1 -- To the Warden of the Institution
Level #2 -- To the Director of the Department of Corrections

**Level #1 Procedure:**

1. Aggrieved inmate will obtain "Request for Resolution of Grievance Form" from any Law Clerk.
2. Grievance will be entered in designated space. Grievance should be entered precisely and should not contain remarks impertinent to problem. Grievance must be legible on all copies. Use of typewriters is allowed.
3. Grievance must be accurately dated in appropriate area. Superior Officer must verify date before processing.
4. Aggrieved must sign the grievance form. Form is self-carbonizing and signature must be legible on all copies.
5. Superior Officer accepting the grievance must sign and date in the margins of the form.
6. Aggrieved will retain the goldenrod copy (last copy) for his personal record.
7. Superior Officer will forward the three remaining copies to the Facility Grievance Coordinator. A number will be assigned to the grievance and it will be entered onto the monthly log.
8. The Grievance Coordinator will conduct an investigation of the grievance and make a recommendation to the Warden or Designee. The investigation by the Grievance Coordinator can be conducted with or without a personal interview with the aggrieved.
9. From the date on which the grievance was filed with the Superior Officer, the Warden or Designee will have twenty-(20) working days in which to respond in writing to the aggrieved. The response will be typed, will be complete and concise, and be entered in the appropriate space on the Grievance Form. The pink copy will be returned to the inmate.



10. Upon receipt of the decision from the Warden or Designee, the aggrieved will have five-(5) working days to determine if he will appeal to the next level within the grievance procedure. If the aggrieved is satisfied with the initial response, the grievance procedure terminates at this point.

**Level #2 Procedures:**

1. If the grievance is not resolved at Level #1 to the satisfaction of the aggrieved, he will have five-(5) working days to again complete the "Request for Resolution of Grievance Form" addressed to the Director or Designee of the Department of Corrections, outlining the grievance and why he comes to be grieved.
2. The form will follow the same steps and procedures as in Level #1, Sections #1 through #10, except the Director or Designee of the Department of Corrections will investigate and respond within thirty-(30) working days instead of the Warden of the affected facility.

**Withdrawal of Grievance:**

The aggrieved may terminate or withdraw grievance at any level within the procedure. This is accomplished by writing the Warden or Designee and requesting termination of the grievance. This communication will also be co-signed and dated by a Superior Officer.

**RECREATION:**

As per schedules, (see appendix A - Recreational Schedule) modules are assigned specific times for recreation in the gym, day rooms, or yard. All modules have a game shelf with an assortment of games and are equipped with tables for playing cards, checkers, chess, etc. The gym is equipped with pool tables, weight machines, free weights, and other recreational equipment. The yard is open, per schedule, for men who wish to play ball, walk, run, lift weights, or just sit. **Running only allowed while actively participating in recreational activities.** Varieties of recreational activities, indoor and out are organized throughout the year. Watch for postings on the bulletin boards and notices in the newsletter. Gambling will not be allowed at any time.

**Recreational Clothing:**

Sweatshirts, pants, and shorts may be worn in the yard and gym and are allowed during transit to and from the yard and gym.

Proper dress is required during indoor (module) recreation.

T-shirts, sweats, shorts, or any other clothing articles may not be altered, torn, cut down, ripped, or changed in any way.

Thermal underwear may not be worn as an outer garment during recreation in the yard, gym, or dayroom.

INFORMAL REQUEST FOR RESOLUTION OF GRIEVANCE

# MEDIUM SECURITY REQUEST SLIP

- [ ] CHAPLAIN
- [ ] JOB
- [ ] WAREHOUSE
- [ ] EDUCATION
- [ ] RECREATION
- [ ] CELL CHANGE
- [x] OTHER: GRIEVANCE COORDINATER
- [ ] HAIRCUT

FROM: STEPHEN REISE ID#: 501887

MOD-CELL: DR 22 B JOB: BLK PORTER

TO: LIEUTENANT FLYNN DATE: July 8 2005

[ ] MISSED HAIRCUT APPOINTMENT
Resubmit After:

REASON: (see attached)

REPLY:

SIGNATURES:
Officer (Required) Responding Staff

LtK.H\doc\form\Request Slip.11/02-1

MY COPY

EXHIBIT "C" PG 1 of 2

7/8/2005

**EXHIBIT "C" PG 2 of 2**

TO: Lieutenant Flynn
Warden Whitman
A. T. Wall

FROM: STEPHEN REISE
DR 22 B/Medium One

SUBJECT: Closing of Sick Call

Dear Sirs,

This informal request for the resolution of grievance pertains to the closing of sick call posted on the Medium One Infirmary entrance door some twelve days out of the past thirty-five days, with the last two recent closings being July 1 2005 and July 8 2005.

The sworn affidavits of Melvin White and A.T. Wall dated January 20 2005, (attached), clearly state that sick call is twice a day. However, not three weeks after the taking of these sworn affidavits, Notice's were posted on February 8 2005 and March 4 2005, (attached), which clearly state that Sick Call is only between 7:15 AM and 8:30 AM ONLY!, both postings bare Melvin White's authorization.

As you can see, this scenario, accompanied by the recent closings of the only sick call times available each day, clearly create an atmosphere of false filing of affidavits in relation to the attached sworn affidavits of Melvin White at Paragraph 8, and A.T. Wall at Paragraph 4, used in District Court Case No. 04-0158(ML). Furthermore the closing of sick call effects mine and others health and well being during a time that such a basic necessity such as hot water is unavailable in our cells to even wash our hands. Not only are we deprived of hot water which is necessary to kill levels of bacteria to protect ourselves from illnesses such as viruses and bacterial formed illnesses and the common cold, treatment such as sick call is unavailable.

Respectfully,